UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGINE MARIE McKIVENS,

                Plaintiff,                          Civil Action No. 11-cv-14268

        v.                                District Judge Sean F. Cox
                                                    Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 11]**

      Plaintiff Georgine Marie McKivens brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties filed summary judgment motions (Dkts. 8, 11), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. 2).

## I. RECOMMENDATION

      For the reasons set forth below, this Court finds that the Administrative Law Judge's decision is supported by substantial evidence. Accordingly, this Court RECOMMENDS that Defendant's Motion for Summary Judgment be GRANTED, that Plaintiff's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## II. REPORT

### A. Procedural History

On February 21, 2007, Plaintiff filed an application for DIB asserting that she became unable to work on December 31, 2005.[1] (Tr. 10.) The Commissioner initially denied Plaintiff's disability application on June 22, 2007. (*Id.*) Plaintiff then filed a request for a hearing, and on March 8, 2010, she appeared with counsel before Administrative Law Judge ("ALJ") Truett M. Honeycutt, who considered the case *de novo*. (Tr. 10-18.) In a June 22, 2010 decision, ALJ Honeycutt found that Plaintiff was not disabled. (*Id.*) His decision became the final decision of the Commissioner on August 8, 2011 when the Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on September 28, 2011. (Dkt. 1.)

### B. Background

Plaintiff was 48 or 49 years old[2] on the alleged disability onset date. (*See* Tr. 27, 290.) She has a Bachelor of Science degree in criminology and is a licensed real estate agent and social worker. (Tr. 27.) In the past, Plaintiff worked as a campaign manager at the Detroit Zoo, a real estate agent, and a social worker. (Tr. 29, 31-39, 49.)

#### 1. Plaintiff's Testimony at the Hearing Before the ALJ

Plaintiff testified to widespread joint pain at her administrative hearing. (Tr. 47-53.) Despite ongoing treatment and medication, Plaintiff testified that she struggles daily with this pain. (Tr. 47.)

---

[1]Plaintiff subsequently amended the initial date of disability after determining that she earned significant gainful income between December 31, 2005 and January 1, 2008.

[2]At the hearing, the Plaintiff stated that her DOB is 1/1/1959. (Tr. 27.) This is also the DOB listed on the SSA Disability Report. (Tr. 178.) However, medical records provided by Plaintiff's treating physician, and Plaintiff's Motion for Summary Judgment, state that her DOB is 1/1/1960. (Tr. 290; Pl.'s Mot. Summ. J. at 4.)

Specifically, Plaintiff testified that she has almost daily migraines, neck and back pain, and knee problems. (*Id.*) Plaintiff further testified that "both my arms, wrist and hands are hurting over the past year, its getting worse and worse now." (*Id.*) She attested that she is "constantly . . . exhausted all the time . . . just from the pain." (Tr. 47-48.)

Plaintiff testified that her level of pain goes through periods of greater and lesser intensity, and that over the last few years, the frequency of bad days has increased. (Tr. 51-52) She stated that in the past, "I'd be down for six weeks, and I'd have a good six weeks. And I don't have that anymore." (Tr. 52.) She testified that, at the time of the hearing, "I have probably five bad days and maybe two good days" per week. (*Id.*)

Plaintiff testified that on bad days she cannot walk without crutches, requires assistance to get to the bathroom, and needs multiple emergency room visits. (Tr. 51.) Plaintiff stated that she "can't even use a walker or a cane or the crutches, because my arms are so bad now." (*Id.*) She testified that she cannot do any household chores or activities of daily living on bad days. (*Id.*) On good days, Plaintiff said that she can walk, as she did to get to the hearing, and go to the grocery store without an electric cart. (*Id.*)

When questioned by the ALJ, Plaintiff stated that she quit her job as a social worker because walking and sitting caused her too much back and neck pain. (Tr. 49-50.) Plaintiff further testified that in 2008, after working for six weeks at a temporary position with the Detroit Zoo, she declined a full time position because of physical problems that led to emergency room visits. (Tr. 29-30.) Plaintiff stated that during 2008 and 2009, she could perform sedentary tasks for two to two-and-a-half hours per day, although at that time, her legs were so bad that she could not get off the couch. (Tr. 55-56.) She testified that, as of the date of the hearing, she could perform a desk job, with

3

occasional hand use for computer entry, for around an hour per day.  (Tr. 54)

       *2.  Medical Evidence*

          *(a) Medical Evidence Relating to Plaintiff's Physical Impairments*

       The record contains medical evidence going back to 2003.  Because Plaintiff engaged in significant gainful employment through 2008, the Court will only summarize the earlier records to provide some useful context.

       Plaintiff visited Dr. Jason Kahn complaining of acute back pain in September 2004.  (Tr. 255.)  Upon examination, Dr. Kahn noted that Plaintiff had full strength, full range of motion and no tenderness.  (*Id.*)  Dr. Kahn felt that the acute pain was from an "unrealized" muscle strain during physical therapy and prescribed Vicodin and Flexeril for the pain.  (*Id.*)

       During October 2004, Plaintiff attended three followup appointments with Dr. Kahn for her acute back pain.  During these visits, Plaintiff reported that the acute pain had subsided somewhat, and Dr. Kahn noted that Plaintiff had no difficulty ambulating around his office.  (Tr. 253, 278.)  He recommended continuing physical therapy for the chronic pain.  (*Id.*)  Despite the reported improvement, Plaintiff complained of difficulty walking distances over two hundred feet.  (*Id.*)  During the second of these three visits, Dr. Kahn noted no obvious swelling of either knee, although during examination, Plaintiff winced with pain at several points.  ( Tr. 288.)  Dr. Kahn remained "not sure as to the underlying etiology, though fibromyalgia[3] type myofascial pain is possible." (Tr.

---

    [3]"Fibromyalgia syndrome is a common and chronic disorder characterized by widespread pain, diffuse tenderness, and a number of other symptoms. . . . [L]ike arthritis, fibromyalgia is considered a rheumatic condition, a medical condition that impairs the joints and/or soft tissues and causes chronic pain."  National Institute of Arthritis and Musculoskeletal and Skin Diseases, *Questions  and  Answers  about  Fibromyalgia* (July, 2011) *available  at* http://www.niams.nih.gov/Health_Info/Fibromyalgia/default.asp.

278.)  He also listed osteoarthritis as another possibility.  (Tr. 288.)

In November 2004, Plaintiff visited Dr. Kahn for a follow up on her progress.  (Tr. 300.)
Plaintiff reported that she could "sit for thirty to sixty minutes and then needs to stand for a few
minutes before she can sit again.  She can stand for about 30 minutes at a time and walk about [200
to 300 feet]."  (*Id.*)

In March 2005, Dr. Kahn examined Plaintiff due to a pain flare up.  (Tr. 298.)  Dr. Kahn
reported that Dr. Garber, a rheumatologist, agreed that she had a fibromyalgia like syndrome.  (*Id.*)
Plaintiff was able to ambulate although she appeared to be in discomfort.  (*Id.*)  Dr. Kahn provided
a Vicodin prescription refill.  (*Id.*)

In April 2005, Plaintiff attended a follow up examination with Dr. Kahn.  Plaintiff reported
that her pain was stable although ongoing.  (Tr. 297.)  Dr. Kahn observed that she was able to
ambulate without a limp.  (*Id.*)

In May 2005, Plaintiff returned to Dr. Kahn, calling his attention to scaly thickened skin on
the backs of her elbows and the knuckle of her left pinkie.  (Tr. 281.)  As a result of this
examination, Dr. Kahn became "concerned about psoriasis with psoriatic arthritis."[4]  (*Id.*)

In July 2005, Dr. David Fivenson, a dermatologist, examined Plaintiff and observed
"hyperpigmented, sporiasiform erythematous scaling plaques"[5] on her elbows.  (Tr. 364.)  He
recommended dry skin care and topical steroid cream.  (Tr. 365.)

---

[4]"Psoriatic arthritis is a form of arthritis that affects some people who have psoriasis — a
condition that features red patches of skin topped with silvery scales."  Mayo Clinic, *Psoriatic
Arthritis* (Dec. 9, 2010) *available at* http://www.mayoclinic.com/health/psoriatic-arthritis/DS00476.

[5]Essentially, a description of spore-like abnormal redness of the skin with scaly patches.
*Dorland's Illustrated Medical Dictionary* 650, 906, 1476, 1780-81. (31st ed. 2007).

In January 2006, Plaintiff returned to Dr. Kahn.  Dr. Kahn reported the results of an appointment with the University of Michigan's Rheumatology Clinic.  (Tr. 292.)  The Clinic's physician "felt patient's symptoms were most consistent with osteoarthritis and question [sic] of underlying fibromyalgia."  (*Id.*)  The Rheumatology Clinic, and Dr. Kahn, recommended exercise, weight loss, physical therapy, Motrin and x-rays.  (*Id.*)

Plaintiff returned for appointments and examinations with Dr. Kahn three times between April and August 2006, complaining that her back and neck pain was flaring, especially with activity.  (Tr. 290, 308-09.)  At each of the examinations, Dr. Kahn recommended physical therapy for pain relief and strength, and weight loss.  (Tr. 290, 308-09.)

In November 2006, Dr. Kahn examined Plaintiff twice regarding right knee pain.  (Tr. 301.)  During the first visit, Dr. Kahn noted possible mild effusion and some knee tenderness.  (Tr. 303.)  At the second appointment, two weeks later, Dr. Kahn noted that "her right knee has tenderness to palpation in all areas[,]" although her "passive range of motion is full."  (Tr. 301.)  Dr. Kahn referred her to Dr. Corey R. Dean, an orthopedic surgeon, for an evaluation.  (*Id.*)

In December 2006, Plaintiff visited Dr. Dean twice regarding the aforementioned knee pain.  (Tr. 302, 318.)  During the first visit, Plaintiff reported pain at a level of ten out of ten, with ten indicating the highest level of pain.  (Tr. 318.)  Dr. Dean drained fluid from her right knee, and provided a steroid injection.  (Tr. 302, 318.)  Following the procedure, at the second appointment, Plaintiff described an improvement in pain, and Dr. Dean reported that Plaintiff exhibited a normal range of motion in the knee.  (Tr. 302.)

In January 2007, Plaintiff visited Dr. Kahn to review the results of the visits to Dr. Dean and Dr. Julie Holschen.  (Tr. 322.)  Upon examination, Plaintiff reported slightly less pain with slight

knee tenderness, and was able to ambulate with a slight limp.  (*Id.*)  Dr. Kahn concurred with the diagnosis of osteoarthritis and recommended physical therapy, weight loss and crutches to manage pain.  (*Id.*)

In February 2007, Plaintiff brought a "disability form for a loan discharge" to Dr. Kahn.  (Tr. 320.)  Dr. Kahn felt that she may have some "partial and temporary disability," but did not "feel comfortable calling her totally disabled" since there were "still jobs that [Plaintiff] could potentially do, though not full time. . . ."  (*Id.*)  Dr. Kahn noted that Plaintiff was limping only very slightly, and was able to move around better than before.  (*Id.*)  He also reported that her knee arthritis seemed slightly better although her skin was "flaring up" causing him to wonder about psoriatic arthritis of the hands.  (*Id.*)

In February 2007, Plaintiff returned to dermatologist Dr. Fivenson because of ongoing psoriasis.  (Tr. 362.)  Dr. Fivenson's examination revealed "psoriasiform erythematous scaling plaques" on her elbows and swelling of her fingers, wrists, knees and ankles.  (Tr. 363.)  Dr. Fivenson did not initiate treatment at that time because he wanted to rule out psoriatic arthritis, lupus and a few other possibilities.  (*Id.*)  The next month, Plaintiff returned to Dr. Kahn who reviewed, but added nothing new to, Dr. Fivenson's diagnosis.  (Tr. 317.)

In May 2007, Dr. Kahn examined Plaintiff regarding complaints of neck pain, and to follow up on her Baker's cyst.  (Tr. 316.)  Plaintiff reported that her knee pain had "settled down," but her fibromyalgia neck pain was worse.  (*Id.*)  Dr. Kahn noted that Plaintiff was "able to function," and recommended physical therapy.  (*Id.*)

In June 2007, Plaintiff visited Dr. Kahn again.  (Tr. 315.)  His medical record states that Plaintiff "has fibromyalgia with osteoarthritis" and that there was some concern for psoriatic

arthritis.  (*Id.*)  Because of these concerns, Dr. Kahn referred Plaintiff to Dr. Fivenson who in turn referred Plaintiff to "rheumatology and neurology [for evaluation] before initiating treatments." (*Id.*)

In December 2007, Plaintiff returned to Dr. Kahn regarding knee pain and difficulty walking. (Tr. 329.)  Plaintiff told Dr. Kahn that an orthopedic surgeon had informed Plaintiff that "short of a knee replacement they did not know what they could offer her." (*Id.*)  Dr. Kahn examined Plaintiff and found a "fullness in the popliteal area."[6] (Tr. 329.)

In January 2008, Plaintiff visited Dr. Kahn regarding left knee pain.  (Tr. 327.)  Dr. Kahn's examination revealed some effusion and tenderness to palpation.  (*Id.*)  Dr. Kahn recommended weight loss and arthrocentesis.[7]  (*Id.*)

In June 2008, Dr. Kahn examined Plaintiff again regarding a flare up in her fibromyalgia that limited her ability to walk.  (Tr. 325.)  Plaintiff complained of a diffuse muscle pain, and upon examination exhibited tenderness.  (*Id.*)  Dr. Kahn prescribed a change in medication to Lyrica.  (*Id.*)

An only partially reproduced medical record indicates that in November 2008, Dr. Kahn wrote, "I do not believe the [Plaintiff] has lupus."  (Tr. 336.)  He prescribed Vicodin, and referred her to rheumatology for an evaluation prior to starting treatment for psoriatic arthritis.  (*Id.*)

In March 2009, Plaintiff visited Dr. Kahn for a variety of complaints including lower extremity edema.  (Tr. 333.)  Plaintiff explained that while on a plane to Florida her ankles became

---

[6]Popliteal refers to the back part of the leg, behind the knee joint.  Merriam Webster Dictionary, *available at* http://www.merriam-webster.com/dictionary/popliteal.

[7]Arthrocentisis is a procedure of withdrawing fluid from a joint for analysis.  Mayo Clinic, *Water on the Knee; Tests and Diagnosis* (Jun 16, 2012) *available at* http://www.mayoclinic.com/health/water-on-the-knee/DS00662/DSECTION=tests-and-diagnosis.

8

swollen, limiting her ability to walk.  (*Id.*)  Plaintiff "thinks she has put on over 50 lbs over the past few months."  (*Id.*)  Dr. Kahn recommended further testing for the edema.  (*Id.*)

Later that March, Dr. Aaron Daniel examined Plaintiff regarding her knee pain.  (Tr. 332.) Plaintiff stated her pain to be at a level of seven out of ten.  (*Id.*)  She further stated that she could only walk temporarily and only for short distances.  (*Id.*)  Upon examination, Dr. Daniel observed that her left knee "has mild limitation of range of motion due to pain" and that she has significant crepitus[8] and pain on palpation and flexion.  (*Id.*)  Dr. Daniel diagnosed Plaintiff with arthritis of the left knee, and stated that she may have strained her left knee's medial collateral ligament.  (*Id.*)  He prescribed Naprosyn and ice, and stressed the importance of weight loss for her chronic osteoarthritis.  (*Id.*)

In May 2009, Plaintiff returned to Dr. Kahn complaining of right ankle pain, right elbow pain, psoriasis and fatigue.  (Tr. 341.)  Regarding the psoriasis, Dr. Kahn noted that Plaintiff had recently seen Dr. Fivenson and Dr. Su, a rheumatologist, "but it does not look like they are pursuing systemic treatment."  (*Id.*)

In June 2009, Plaintiff returned to Dr. Dean with complaints of right elbow pain.  (Tr. 340.) Upon examination, Plaintiff exhibited point tenderness and pain upon supination, pronation and forced extension of the wrist.  (*Id.*)  Dr. Dean gave Plaintiff an injection of Depo-Medrol and recommended stretching and strengthening exercises as well as continued use of braces.  (*Id.*)

Also in June 2009, Plaintiff returned to Dr. Fivenson for her psoriasis.  (Tr. 359.)  Dr. Fivenson noted swelling in Plaintiff's right arm and wrist, tenderness to palpation in Plaintiff's

---

[8]Crepitus refers to the cracking sound made in joints when bone rubs against bone. *Dorland's Illustrated Medical Dictionary* 467. (31st ed. 2007).

lower back and hip, and psoriasis lesions.  (Tr. 360.)  Dr. Fivenson prescribed "dovonex, methotrexate-low dose trial" for her psoriasis.  (*Id.*)

In August 2009, Plaintiff followed up with Dr. Fivenson.  (Tr. 353.)  Plaintiff reported moderate improvement in pain, and Dr. Fivenson's examination noted that the psoriasis lesions were starting to fade.  (Tr. 354-58.)  Dr. Fivenson reported that the "condition has begun to respond to new treatments."  (Tr. 358.)

This improvement continued and in October 2009, Dr. Fivenson noted that Plaintiff reported lessened pain and much better arthritis, yet still complained of intermittent pain and a locking sensation in her feet and wrists.  (Tr. 352.)  In his report, Dr. Fivenson continued to feel that the psoriasis was "responding to new treatments."  (*Id.*)

In January 2010, when Dr. Fivenson examined Plaintiff's scalp, arms and hands, he found psoriasis complicated by flaring arthritis and swelling.  (Tr. 346.)  Dr. Fivenson still concluded, however, that the "condition has begun to respond to new treatments."  (*Id.*)

In February 2010, Plaintiff visited rheumatologist Dr. Martin Garber.  (Tr. 367.)  Dr. Garber reported that "[s]ince starting Enbrel in January, she noticed significant improvement, particularly with diminished pain in her right knee as well as generalized aches and pains.  Her psoriasis on her arm still is not yet improved."  (*Id.*)

In March 2010, Plaintiff returned to Dr. Fivenson for an evaluation of her psoriasis.  (Tr. 370.)  Dr. Fivenson noted that "[c]ompared to [her] previous visit on 1/18/2010, clinically there is almost complete clearing of all lesions."  (Tr. 371.)  Dr. Fivenson went on to write that he was considering a trial of other medication "as patient cannot work effectively and needs repeated courses of oral steroids, has not been able to work full time 2 years due to arthritis."  (*Id.*)

10

On April 2, 2010, after the hearing but before the ALJ issued his opinion, Dr. Kahn wrote

a letter at Plaintiff's request "regarding her medical problems." (Tr. 369.) He stated:

> She suffers from psoriatic arthritis and this is severe. She also likely
> has fibromyalgia. She likely also has osteoarthritis. This
> combination causes her to have significant pain in the neck,
> shoulders, elbows, wrists, hands, hips, knees, and feet. She is taking
> immunosuppressant medications and is co-managed by
> Rheumatology and Dermatology. Despite this, her symptoms remain
> severe.
>
> She is able to do most of her ADLs but certainly is limited beyond
> that. I think that working, even in a sitting position, would be
> difficult for any significant amount of time at this point, given her
> severe symptoms.

(*Id.*) Dr. Garber also provided a post-hearing letter that failed to identify any specific limitations

caused by Plaintiff's symptoms.

### (b) Opinions on Behalf of the State Disability Determination Services

In June 2007, Dr. Paul Ratcliff, D.O., examined Plaintiff on behalf of the Social Security

Administration. (Tr. 234.) Plaintiff complained to Dr. Ratcliff of lupus and arthritis in the cervical

spine, hands and knees. (*Id.*) Dr. Ratcliff found that Plaintiff's gait was normal, that she had no

difficulty with orthopedic maneuvers, and that she walked without an assistive device. (Tr. 234-37.)

He also found that she had normal grip strength, full hand dexterity, full range of motion in the joints

that he checked, no obvious bone deformities, no edema, no tenderness and no effusion. (Tr. 235.)

He concluded that Plaintiff "exhibited no signs of a skin rash or evidence for lupus arthritis." (Tr.

237.)

Also in June 2007, a non-physician, State Disability Determination Services ("DDS")

consultant reviewed Plaintiff's medical records and provided a physical residual functional capacity

assessment ("RFC"). (Tr. 249.) The reviewer noted that Plaintiff's

11

> medical records do not support the degree of limitation alleged by the claimant. Her vision is normal with eyeglasses, she has full use of her arms and hands. She has normal gait. There is normal strength in her extremities and no neurological deficits. While the claimant may experience some generalized discomfort, this discomfort would not severely limit her activities. She is partially credible.

(*Id.*) The reviewer provided that Plaintiff could lift twenty-five pounds frequently, stand for six hours and sit for six hours during an eight-hour workday, was unlimited in pushing and pulling in the lower extremities, and had no other limitations. (Tr. 245-48.)

During the administrative hearing, Dr. Alec Steele, the court appointed Medical Expert ("ME"), testified regarding Plaintiff's impairments and residual functional capacity. (Tr. 63-66, 67-84) Dr. Steele is a specialist in rheumatology, and worked for many years as Chief of the Division of Rheumatology at a large Texas hospital. (Tr. 75.) Dr. Steele based his opinions on his review of all of Plaintiff's medical records; he did not physically examine Plaintiff or speak to her treating physicians. (Tr. 76.) Dr. Steele listed Plaintiff's severe impairments as (i) "degenerative arthritis in her knees," (ii) "chronic pain syndrome," and (iii) obesity. (Tr. 63-64.)

Describing Plaintiff's RFC, Dr. Steele stated that, over an eight hour work day, Plaintiff could walk or stand for intermittent periods of fifteen minutes for up to two and a half hours total, sit for six hours, and lift ten pounds occasionally and five pounds frequently. (Tr. 67-68.) He further testified that Plaintiff could perform very little bending, stooping and squatting, although he declined to limit Plaintiff's use of her hands. (Tr. 66-68.)

### 3. *Vocational Expert's Testimony at the Hearing Before the ALJ*

A Vocational Expert ("VE") also provided testimony at Plaintiff's administrative hearing. (Tr. 72.) The ALJ asked the VE to consider whether the Plaintiff could perform her prior occupations of social work or family therapy. (*Id.*) The VE testified that given the ME's finding

12

that Plaintiff could perform sedentary work[9], she would be able to work as a social worker or family therapist. (Tr. 72.)  The VE further testified, however, that within the limitations on work as described by the Plaintiff herself, neither job would be possible.  (Tr. 73.)

### C.  Framework for Disability Determinations

Under the Social Security Act (the "Act") Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment

---

[9]*See* S.S.R. 83-10, 1983 WL 31251, at *5 ("The regulations define sedentary work as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools . . . .  Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday").

meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2008 – Plaintiff's amended alleged onset date. (Tr. 12.) At step two, the ALJ found that Plaintiff had the following severe impairments: "osteoarthritis, psoriatic arthritis, and obesity." (*Id.*) At step three, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 13.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform the full range of sedentary work. (Tr. 14.) At step four, the ALJ found that Plaintiff could perform her past relevant work as a social worker and counselor, and thus was not disabled as defined in the Social Security Act. (Tr. 17-18.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must

14

affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535.  There is no requirement, however, that either the ALJ or this

Court discuss every piece of evidence in the administrative record.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)).  Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

### F.  Analysis

Plaintiff appears to raise three related claims of error on appeal: the ALJ violated the treating source rule by (i) not giving "controlling weight" to her treating doctors' statements that Plaintiff is totally disabled; (ii) not giving "controlling weight" to her treating doctors' statements that Plaintiff cannot perform sedentary work; and (iii) impermissibly giving great weight to the ME's opinion.  (Pl.'s Mot. Summ. J. at 4-5.)  The Court will address each argument in turn.

> #### 1.  *To the Extent that Plaintiff's Treating Physicians Opine on Issues Reserved to the Commissioner, They are Not Entitled to Any Particular Weight.*

Plaintiff argues that the ALJ should have given controlling weight to her treating physicians' "opinions that she is totally disabled."  (*Id.* at 5.)  The Court disagrees.

When a treating physician submits an opinion on an issue reserved to the Commissioner, such as whether the claimant is "disabled" or "unable to work," the opinion is not entitled to any particular weight.  20 C.F.R. §§ 404.1527(d), 416.927(d); S.S.R. 96-5p; *Bass,* 499 F.3d at 509 (6th Cir. 2007)).  Dr. Garber's letter, dated April 29, 2011, does not provide any medical opinion as to Plaintiff's RFC or limitations on employment; the letter merely lists Plaintiff's symptoms, and

states that Plaintiff is disabled.[10]  (*See* Tr. 230.)  Likewise, Dr. Kahn's letter, dated April 2, 2010,

also states that Plaintiff is disabled.  (Tr. 369.)  The ALJ did not  mention these opinions of total

disability.   Instead, he focused on the ME's opinion, and the treating physicians' medical

observations, diagnoses, and treatments.   (Tr. 16-17.)   Therefore, with regard to the treating

physicians' statements of disability, the ALJ's analysis complies with the applicable rules and

regulations.

> ### 2. *The ALJ Did Not Violate the Treating Source Rule by Assigning Plaintiff an RFC of Full Sedentary Work.*

Plaintiff argues that the April 2, 2010 letter from Dr. Kahn is a treating source opinion

preventing Plaintiff from performing even sedentary tasks, and should be given controlling weight.

(Pl. Mot. Summ J. at 4-7.)  While a close call, the Court cannot find that the ALJ reversibly erred

in declining to interpret Dr. Kahn's letter as precluding Plaintiff from performing sedentary work.

The treating-source rule generally requires an ALJ to give deference to the medical opinion

of a claimant's treating source.  (*See* S.S.R. 96-2p).  A "medical opinion" is defined as "statements

from physicians and psychologists or other acceptable medical sources that reflect judgments about

the nature and severity of [Plaintiff's] impairment(s), including [Plaintiff's] symptoms, diagnosis

and prognosis, what [Plaintiff] can still do despite impairment(s), and  [Plaintiff's] physical or

mental restrictions."  20.C.F.R. § 404.1527(a)(2).  "An ALJ must give the opinion of a treating

source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical

and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in

[the] case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting

---

[10]Also, the letter was submitted long after both the extension period for new evidence and
the completion of the ALJ's decision.  (*See* Tr. 18, 88, 230.)

S.S.R. 96-2p).

It is important to note that during the administrative hearing, the ALJ explicitly identified as a problem, the lack of detail in the statements provided by Plaintiff's treating physicians regarding her physical limitations. (Tr. 86-88.) In other words, the ALJ had evidence regarding Plaintiff's symptoms and diagnoses, but insufficient evidence regarding her physical limitations. He found lacking from Plaintiff's doctorsspecific opinions as to what Plaintiff could and could not do as a result of her osteoarthritis and psoriatic arthritis.. Thus, the ALJ held the record open for an additional five weeks for Plaintiff to go back to her doctors for better statements regarding her RFC. (Tr. 88.) The ALJ was clear that he wanted specific limitations regarding walking, standing, carrying, hand use and expected pain. (*Id.*) Plaintiff provided only the Kahn and Garber letters in response. (Tr. 230, 369.)

Despite the ALJ's specific request at the hearing, crucially lacking from Dr. Kahn's statement are specific limitations that prevent Plaintiff from performing sedentary work. Dr. Kahn's letter states that Plaintiff "is able to do most of her ADLs but is certainly limited beyond that. I think that working, even in a sitting position, would be *difficult for any significant amount of time* at this point. . . ." (Tr. 369) (Emphasis added.) Without further clarification, Dr. Kahn's statement provides little insight into Plaintiff's actual restrictions. Does "difficult" mean that Plaintiff is unable to participate in *any* substantial gainful activity at the sedentary level? And what does "significant amount of time" mean? These questions remain unanswered in Dr. Kahn's statement. (*See Id.*) As such, it is not a medical opinion as defined by 20 C.F.R. 404.1527(a)(2). *See Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 n.3 (6th Cir. 2009) (reasoning that a treating physician's statement that fails to address "the specific extent of [Plaintiff's] limitation" is "outside the scope

18

of 'medical opinions' as defined in 20 C.F.R. § 404.1527(a)(2)."), *Bass*, 499 F.3d at 510 (holding that since Plaintiff's treating physician "made no medical judgments, the ALJ had no duty to give such observations [about Plaintiff's condition] controlling weight or provide good reason for doing so."). Therefore, the ALJ did not violate the treating source rule by assigning Plaintiff an RFC of a full range of sedentary work.

> *3. The ALJ Did Not Violate the Treating Source Rule by Assigning Great Weight to the ME's Opinion.*

Plaintiff argues that the ALJ violated the treating source rule by giving great weight to the non-examining ME's opinion that Plaintiff could perform sedentary work. (Pl. Mot. Summ. J. at 7.) While the Court has some concerns that Dr. Steele provided an RFC based on different impairments than those found by the ALJ, neither party raises this as an issue.

An ALJ may rely upon the opinions of non-treating physicians, although the ALJ is not bound by them, when those opinions are based on the medical evidence in the record. *Hale v. Sec'y H.H.S.*, 816 F.2d 1078, 1083 (6th Cir. 1987)*, Reynolds v. Sec'y of H.H.S.*, 707 F.2d 927, 930 (6th Cir. 1983). However, the opinion of a non-examining physician is entitled to little weight if contrary to a treating physician's medical opinion. *See Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). When no treating physician opinion has been granted controlling weight, as here, the medical opinion of a consultative examiner is to be weighed considering all of the factors identified in 20 C.F.R. § 404.1527(c)(1) through (6). 20 C.F.R. § 404.1527(e)(2)(iii). These factors include, among others, the examining relationship, the treatment relationship, the supportability of the opinion by relevant evidence, the consistency of the opinion with the record as a whole, and the specialization of the source providing the opinion. 20 C.F.R. § 404.1527(c)(1)-(6).

In this case, the ALJ conducted a detailed review of the objective medical evidence contained

in the records of Dr. Kahn, Dr. Su, Dr. Fivenson and Dr. Garber.  (Tr. 15-17.)  After noting their observations, and highlighting the improvement in Plaintiff's condition noted by each doctor, the ALJ concluded that they support, and are consistent with, the ME's opinion.  (*Id.*)  Specifically, the ALJ found that the ME's opinion of Plaintiff's residual functional capacity was fairly consistent with Dr. Kahn's statements.  (Tr. 17.)  As discussed above, Dr. Kahn did not provide his own detailed residual functional capacity assessment.  He indicated in 2007 that Plaintiff was capable of at least part-time work, and his April 2010 letter states only that it would be "difficult" for Plaintiff to perform "significant" periods of sedentary work.  (Tr. 17, 369.)  Since Dr. Kahn did not definitively preclude Plaintiff from sitting for six hours per day (the sitting involved in a sedentary job) and did not address whether Plaintiff could alleviate her difficulty with sitting through a sit/stand option, the ALJ determined that Dr. Kahn's statement was fairly consistent with the ME's opinion that Plaintiff could perform sedentary work.  (Tr. 17.)  Additionally, the ME's opinion regarding Plaintiff's RFC is supported by substantial evidence in the medical record.  (Tr. 68-72, 76-85.)  Accordingly, the ALJ did not err in giving the ME's opinion "great weight."

### G.  Conclusion

For the foregoing reasons, this Court finds that the ALJ complied with the treating-source rule in evaluating the opinions by Plaintiff's doctors.  Accordingly, this Court RECOMMENDS that Defendant's Motion for Summary Judgment be GRANTED, that Plaintiff's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: July 9, 2012

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 9, 2012.

s/Jane Johnson
Deputy Clerk